UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

IN RE:                                                    CASE NO. 12-31309

Henry Lee Johnson Jr., SSN xxx-xx-2105
Sharon Elaine Williams-Johnson, SSN xxx-xx-7206

    321 Gettysburg Road, Unit C
    Belleville, IL 62226

DEBTORS                                                  CHAPTER 11

---

DISCLOSURE STATEMENT 01 - AMENDED

---

NOW COME Debtors and Debtors-in-Possession Henry Lee Johnson Jr. and Sharon Elaine Williams-Johnson, hereinafter "Debtors," and, for their Disclosure Statement in the above-entitled Chapter 11 bankruptcy case, state as follows:

## 1. INTRODUCTION AND REPRESENTATIONS

### A. INTRODUCTION

Debtors have prepared and are disseminating this Disclosure Statement to all holders of claims against them for the purpose of informing these claim holders of the terms and conditions contained in their Chapter 11 Plan of Reorganization, hereinafter "Plan," and of its potential impact on the holder's claims. Debtors believe this Disclosure Statement contains information that is material, important and necessary for their creditors, especially those creditors whose claims are impaired under the terms of the Plan, to arrive at an informed decision concerning whether to accept the aforesaid Plan. A summary of the Plan that Debtors are proposing can be found in the section entitled SUMMARY OF PLAN OF REORGANIZATION beginning on Page 5 herein. However, review of this summary is not a substitute for a full review of the entire Plan, which is incorporated, by reference herein, as if fully set forth.

### B. REPRESENTATIONS

NO REPRESENTATIONS CONCERNING THE DEBTORS OR THEIR PROPOSED PLAN OF REORGANIZATION ARE AUTHORIZED OTHER THAN AS ARE SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS THAT PURPORT TO SECURE YOUR ACCEPTANCE OF THE PLAN PROPOSED BY DEBTORS, OTHER THAN AS ARE CONTAINED HEREIN, SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A

CLAIM. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN REVIEWED OR PASSED UPON BY AN ACCOUNTANT. THE DEBTORS ARE NO ABLE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY ALTHOUGH ALL SUCH INFORMATION IS ACCURATE TO THE BEST OF DEBTORS' INFORMATION, KNOWLEDGE, AND BELIEF.   THE COURT HAS NOT VERIFIED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN AND ITS APPROVAL OF THIS DISCLOSURE STATEMENT, IF OBTAINED, DOES NOT IMPLY THAT IT ENDORSES OR APPROVES ANY PLAN OF REORGANIZATION, BUT ONLY THAT IF THE INFORMATION IS ACCURATE, IT IS SUFFICIENT TO PROVIDE AN ADEQUATE BASIS FOR ALL CREDITORS AND INTERESTED PARTIES OF RECORD TO MAKE INFORMED DECISIONS ABOUT WHETHER TO APPROVE OR REJECT THE PLAN OF REORGANIZATION TO BE PROPOSED BY DEBTOR.

## 2.  DEFINED TERMS; RULES OF CONSTRUCTION

Most words or phrases used in this Disclosure Statement shall have their usual and customary meanings.  Some words or phrases when used in the context of the Disclosure Statement with initial capital letters shall have the definitions set forth in Exhibit 1 to the Plan of Reorganization.  Unless otherwise defined, the terms used in this Disclosure Statement shall have the same meaning as in the United States Bankruptcy Code or the Federal Rules of Bankruptcy Procedure.

The rules of construction used in 11 U.S.C. §102 shall apply to the construction of this Disclosure Statement.  Unless the context clearly requires otherwise, words in any gender shall include all other genders, whether masculine, feminine or neutral, and singular shall include the plural and plural shall include the singular.

## 3.  GENERAL OVERVIEW

Debtors are individuals, a husband and wife, who own and operate a rental real estate business.  Debtors own and rent two houses, six duplexes, a 3-unit apartment building, two 4-unit apartment buildings, a 5-unit apartment building, and a 7-unit apartment building for a total of 37 individual rental units.  Debtors began acquiring these real estate properties more than 17 years ago for the purpose of developing supplemental income for both now and when they retire.

## 4.  CONDITIONS CONTRIBUTING TO REORGANIZATION

There were two triggering events that led to Debtors filing their Chapter 11 petition for the purposes of reorganizing their real estate rental business.

### A.  The Lawsuit Against St. Clair County, Illinois

Joint Debtor Sharon Elaine Williams-Johnson had a contract with the State of Illinois Rental Housing Support Program.  This contract provided housing subsidies for lower and low income household and was administered by the Intergovernmental Grants Department of St. Clair County, Illinois.  The contract provided that St. Clair County would provide eligible tenants and pay the housing subsidy for those tenants, who would occupy 15 of Debtors' 37 units.

In practice, however, the Intergovernmental Grants Department would not consistently provide eligible tenants, despite maintaining a substantial waiting list of such tenants, leaving units empty for months at a time, and then, also failed to pay the subsidies on the occupied units in a timely manner, while Debtors continued to have to make their monthly mortgage payments on the rental units, as well as maintain common areas and pay the utilities thereon.

Debtors made numerous complaints, requesting that the Intergovernmental Grants Department perform its obligations under the contract.  After these complaints were ignored for almost a year, Debtors had no choice but to file a lawsuit in July, 2011, for breach of contract, seeking damages for the lost vacancies and unpaid subsidies.

The Intergovernmental Grants Department then waited until 15 days before the next quarterly subsidy payment was due, and then, responded by summarily terminating the contract. Then, it ordered all subsidized tenants to immediately vacate Debtors' unit and refused to make even *quantum meruit* payments on behalf of the tenants.  Since many of the subsidized tenants were not able to vacate Debtors' units until the following month, Debtors lost substantial income in the amount of several thousands of dollars while refurbishing the subsidized units and re-renting them.

B.  THE BALLOON PAYMENT ON THEIR RESIDENCE

Debtors had a promissory note that was amortized over 15 years but had a balloon payment that became due in October, 2011.  This promissory note was secured by a mortgage on their residence.  Even though Debtors had made bi-monthly payments for more than 10 years on the note secured by their residence, First County Bank, a subsidiary of First Collinsville Bank, refused to renew the note when Debtors approached it about refinancing and restructuring the balloon payment.

Declaring that it had not taken any "bail-out" money that would obligate it to accommodate Debtors in refinancing and/or restructuring the note on their residence, First County Bank also demanded payoff on all of its promissory notes.  These notes covered three rental properties – a house, a 4-unit apartment building, and the 7-unit apartment building on the grounds that insecurity on one note allowed it to claim insecurity on all the notes.

Debtors were unable to find alternative financing, and, thereafter, First County Bank commenced a foreclosure action in the St. Clair Circuit Court, declaring that a default on the residential mortgage also constituted a default on all commercial mortgages.  The filing of this foreclosure action immediately precipitated the filing of Debtors' petition to seek relief under the United States Bankruptcy Code.

5.  CURRENT OPERATIONS

A.  CURRENT MANAGEMENT

Sharon Williams-Johnson manages the day-to-day activities of the real estate business.  She also works part-time and seasonally for the United States Census Bureau.  Henry Johnson works fulltime as a building inspector for the City of Jennings, Missouri, but handles almost all maintenance and repairs on the properties.  Mr. Johnson also handles data collection for preparation Debtors' Federal and state personal income tax returns, as well as the associated annual income and

expense projections.

B. INITIAL POST-PETITION ACTIVITY

During the pendency of its bankruptcy case, Debtors have continued to provide safe, decent, and sanitary housing for their tenants and maintain, and, in some case, improve their real estate property.   Debtors continue to be the only employees of their business.

6. FUTURE OPERATIONS

During the pendency of this Chapter 11 case, Debtors have surrendered their interest in their residence, which has reduced their net monthly mortgage expenses by $2,395.00.  This decrease in monthly expenses has been partially offset by the loss of approximately $1,338.00 in rental income when the Debtors recently moved into two (2) of the apartments in the 5-unit apartment building at 321 Gettysburg Road in Belleville, Illinois, as their replacement housing.

In addition to improving cash flow, Debtors have continued to find quality private tenants in order to improve on their traditional vacancy rate of 20 percent.  Although vacancies are inevitable, Debtors are seeking to lower the vacancy rate to 10 percent.  Ms. Johnson also is continuing to aggressively pursue her lawsuit for damages for breach of contract against St. Clair County, Illinois.

Debtors have been operating under this concept of reorganization since August, 2012, and have steadily and consistently improved their financial stability.  Debtors also have paid all of their post-petition obligations, including real estate taxes, and produced a small monthly profit each month except one.  Debtors plan to continue this trend and believe the proposed restructuring of their loans on the commercial real estate will produce further financial stability regardless of the volatility of the economy.

7. FINANCIAL PROJECTIONS

A. CURRENT OPERATIONS

Debtors estimate that after confirmation they will generate an average of $21,944.70 in gross rental receipts each month at 90 percent occupancy.

Debtors' proposed monthly mortgage payments for principal and interest total approximately $8,172.83.  Debtors' monthly payments for real estate taxes and insurance coverage, whether escrowed or paid directly, total approximately $3,951.30.  Debtors' monthly payments for expenses related to common area maintenance and utilities, misc. maintenance, and reserve for replacement total approximately $1,750.00.  Total real estate operating expenses are approximately $13,874.13.  Debtors estimate that monthly legal fees and court costs associated with discovery and trial preparation in the St. Clair Circuit lawsuit will be approximately $1,000.00.  As a result, Debtors' total average expenses per month related to their real estate business are approximately $14,874.13.

Debtors' monthly personal living expenses, including the reduced monthly payment of $396.00 to the St. Louis Community Credit Union for the 2012 GMC Sierra pickup truck, but not including a payment for the use of the two (2) apartments at 321 Gettysburg Road in Belleville, Illinois, total $3,628.75.  Debtors' monthly net income from employment and other sources total

$3,029.28, requiring Debtors' monthly use of $599.47 from the net income from the rental estate business.

These total expenses are as follows:

|  |  |  |
|---|---:|---|
| $ | 8,172.83 | Mortgage payments (P&I) |
|  | 3,951.30 | Escrow (Taxes & insurance) |
|  | 1,750.00 | Maintenance & reserve |
|  | 1,000.00 | Court costs |
|  | 599.47 | Personal living expenses |
| Total | $15,473.60 |  |

After deducting these monthly expenses from the total rental business income (at 90 percent occupancy) of $21,944.70, approximately $6,471.10 is left for distribution to priority creditors and for creation of a pool amount to be paid to unsecured creditors pending recovery, if any, in the lawsuit against St. Clair County, Illinois.

Obviously, negotiations with secured creditors, and particularly with the mortgage lenders, may result in higher monthly payments for principal and interest as the final terms necessary to obtain confirmation of the Plan of Reorganization are agreed upon, but Debtors anticipate making a monthly payment, *pro rata*, to holders of Unsecured Claims of approximately $4,000.00 for a pool amount of $240,000.00 over five years, which already exceeds the total amount of all filed Unsecured Claims.

B.  SOURCE AND APPLICATIONS OF FUNDS UPON CONFIRMATION

Debtors have been able to accumulate a small operating reserve during the interim between the filing of its petition herein and the date of this Disclosure Statement.  Further, a careful review of Debtors' Monthly Operating Reports since the date of filing shows that there has only been one month with a negative cash flow, even with the rental units at less than 90 percent capacity.

Debtors propose to initially fund their Plan of Reorganization by committing the above-referenced sums set forth in Section 7.A from continued operation of their rental real estate business to pay the holders of all Allowed Secured Claims and Allowed Unsecured Claims in full, provided, however, in the event that said sums are not sufficient to pay all Allowed Claims in full, then any recovery on that breach of contract lawsuit in the St. Clair Circuit Court shall supplement the aforesaid payments.

8.  SUMMARY OF PLAN OF REORGANIZATION

ALTHOUGH THIS SUMMARY IS NOT A SUBSTITUTE FOR A CAREFUL READING OF THE PLAN, THE FOLLOWING MATERIAL CONTAINS A GENERAL DISCUSSION CONCERNING THE TREATMENT OF ALLOWED CLAIMS UNDER THE PLAN.

A.  TREATMENT OF CLAIMS

1.  Administrative and Priority Tax Claims.

(a)  Administrative Claims - Unclassified.

(i)  Filing Administrative Claims and Deadline.  Any Person that claims to hold an Administrative Claim, other than Post-Confirmation Professional Fee Claims, shall file with the Bankruptcy Court an application for payment of such asserted Administrative Claim and shall serve notice thereof on all parties entitled to such notice on or before the midnight occurring 14 days after the Effective Date.  The failure to timely file the application on or before the aforesaid deadline shall result in the Claim being forever barred.

(ii)  Payment of Allowed Administrative Claims.  Each Claimant holding an Administrative Claim, except as otherwise set forth in this Plan, shall receive from the Reorganized Debtor either: (i) with respect to Administrative Claims that are Allowed Claims on the Closing Date, the amount of such Claimant's Allowed Claim in one (1) cash payment on the Closing Date, or (ii) with respect to Administrative Claims that become Allowed Claims after the Closing Date, the amount of such Claimant's Allowed Claim in one (1) cash payment within seven (7) business days after such Claim becomes an Allowed Administrative Claim, or, (iii) such other treatment as agreed upon by the Reorganized Debtor and such Claimant.

(iii)  Pre-Confirmation Professional Fee Claims.  Each Professional whose retention with respect to Debtor's case has been approved by the Bankruptcy Court shall be required to file with the Bankruptcy Court a Professional Fee Claim application for pre-confirmation expenses within 14 days after the Effective Date and to serve notice thereof on all parties entitled to such notice.  The failure to timely file any such application will result in that Professional Fee Claim for pre-confirmation expenses being forever barred.  A Professional Fee Claim with respect to which an application is properly filed shall become an Allowed Administrative Claim only to the extent allowed by Final Order.  Professionals shall receive the full amount of their Allowed Administrative Claim in one (1) cash payment from the Reorganized Debtor within seven (7) business days after such Claim becomes an Allowed Administrative Claim.

(iv)  Post-Confirmation Professional Fee Claims.   The Reorganized Debtor anticipates post-confirmation Professional Fee Claims, pursuant to efforts to resolve disputed claims, pursuing any Debtor and Debtor-in-Possession Claims, and otherwise obtaining a Final Order in this Chapter 11 Bankruptcy Case.  Such Fee Claims shall be treated as Administrative Claims under this Plan, and payable in full in one (1) cash payment by the Reorganized Debtor within 21 days of Debtor's receipt of the Professional's application for payment, with supporting documentation, unless the Reorganized Debtor objects within the subject 21 day period.

(b)  Priority Tax Claims – Unclassified.

There are two (2) known Priority Tax Claims:  1) Internal Revenue Service in the amount of $601.96, and 2) Illinois Department of Revenue in the amount of $2,903.32.

Except to the extent that the holder of an Allowed Priority Tax Claim agrees to a

different treatment or the Reorganized Debtor, at its sole option, makes a lump sum payment in full, any holder of an Allowed Priority Tax Claim shall receive from the Reorganized Debtor a series of quarterly cash payments of an aggregate value equal to the Allowed Priority Tax Claim on the Closing Date, over a period through the fifth (5th) anniversary of the date of assessment of such Allowed Priority Tax Claim. All Allowed Priority Tax Claims shall be paid interest at the rate charged on delinquent taxes, currently four (4) percent compounded daily, but re-determined on a quarterly basis for an total average monthly payment of $64.56. In addition to the regular default provisions set forth in this Plan, the failure of the Reorganized Debtor to make the payments provided herein on the Allowed Priority Tax Claims and/or any Postpetition tax obligations shall be considered a default as to the taxing authority and shall authorize collection of any unpaid tax liabilities through that authority's administrative collection provisions, but only after and subject to the approval of the Bankruptcy Court after motion, notice and a hearing.

2. Secured Claims.

*Class 1 – Community First Bank ("CFB") Claim in the approximate amount of $159,882.19,* prior to Debtors receiving credit for all pre-confirmation adequate protection payments. Debtors shall pay this Claim in full, with interest at the rate of 6.00 percent per annum commencing on the Effective Date, in fifty nine (59) equal monthly installments of principal and interest based on a twenty (20) year amortization period, and a final payment of all unpaid principal and interest on the fifth (5th) anniversary of the Closing Date; said payments commencing on or before the Closing Date, and further, provided as follows:

(a)    Except as otherwise expressly provided herein, all terms and conditions of the loan documents evidencing or securing this Claim (the "Loan Documents") shall remain in full force and effect and Claimant also shall retain all liens securing payment of this Claim until payment in full is made.

(b)    In addition to monthly payments of principal and interest, commencing on the Closing Date, and continuing on the same day of each month thereafter until the Claim is paid in full, Debtors shall pay CFB a monthly payment to be applied to real estate taxes on the real property commonly known as 321 Gettysburg Road in Belleville, Illinois (the "Gettysburg Premises"), as estimated by CFB from time to time in its reasonable discretion (the "Estimated Payment"). The amount of the Estimated Payment shall be $680.00, until the real estate taxes on the Gettysburg Premises for the year 2012 have been paid in full. Thereafter, the amount of the Estimated Payment shall be equal to one twelfth (1/12) of the estimated amount of the real estate taxes for 2013 and subsequent years. Bank shall use and apply the Estimated Payments to pay real estate taxes on the Gettysburg Premises upon Debtors' timely presentation of tax statements to Bank, accompanied by payment of the amount, if any, by which the amount due exceeds the Estimated Payments made by Debtors. Within thirty (30) days after the Claim is paid in full, CFB shall refund to Debtors the Estimated Payments, if any, in excess of the amount applied to real estate taxes on the Gettysburg Premises.

(c)    In addition to the above described payments, commencing on the Closing Date, and continuing on the same day of each month thereafter until the Claim is paid in full, Debtors shall deposit the sum of $250.00 per month in a demand deposit account maintained at CFB as a reserve for maintenance and repair of the Gettysburg Premises (the "Gettysburg Reserve Payment").  Debtors shall use funds deposited in such account solely for expenses incurred to maintain and repair of the Gettysburg Premises and shall provide CFB with any itemized written statement of all expenses paid from such account during each calendar month within thirty (30) days after the last day of each calendar month.  The amount of the Gettysburg Reserve Payment shall be adjusted on each anniversary of the Effective Date if CFB, in its reasonable discretion determines that the amount is insufficient to pay the reasonable expenses likely to be incurred to properly maintain the Gettysburg Premises during the ensuing twelve (12) month period.

(d)    In the event debtors default in (i) any payment provided above and fail to cure such default within fourteen (14) days or (ii) performance of any other term or condition of the Plan or the Loan Documents (as modified by the Plan) and fail to cure such default within thirty (30) days, CFB may file a certification of such default with the Court and serve a copy on Debtors' counsel, and further, provided that Debtors shall not be entitled to more than two (2) cures in any 12-month period.  Upon the filing of such certification, the automatic stay with respect to the Gettysburg Premises shall be terminated, without further notice or hearing, and the unpaid balance of the Claim shall be immediately due and payable.

*Class 2 – Community First Bank Claim in the approximate amount of $172,456.06,* prior to Debtors receiving credit for all pre-confirmation adequate protection payments. Debtors shall pay this Claim in full, with interest at the rate of 6.00 percent per annum commencing on the Effective Date, in fifty nine (59) equal monthly installments of principal and interest based on a twenty (20) year amortization period, and a final payment of all unpaid principal and interest on the fifth (5th) anniversary of the Closing Date; said payments commencing on or before the Closing Date, and further, provided as follows:

(a)    Except as otherwise expressly provided herein, all terms and conditions of the loan documents evidencing or securing this Claim (the "Loan Documents") shall remain in full force and effect and Claimant also shall retain all liens securing payment of this Claim until payment in full is made.

(b)    In addition to monthly payments of principal and interest, commencing on the Closing Date, and continuing on the same day of each month thereafter until the Claim is paid in full, Debtors shall pay CFB a monthly payment to be applied to real estate taxes on the real property commonly known as 302 Estate Drive in O'Fallon, Illinois (the "Estate Drive Premises"), as estimated by CFB from time to time in its reasonable discretion (the "Estimated Payment").  The amount of the Estimated Payment shall be $820.00, until the real estate taxes on the Estate Drive Premises for the year 2012 have been paid in full.  Thereafter, the amount of the Estimated Payment shall be equal to one twelfth (1/12) of the estimated amount of the real estate taxes for 2013 and subsequent years.  Bank shall use and apply the

Estimated Payments to pay real estate taxes on the Estate Drive Premises upon Debtors' timely presentation of tax statements to Bank, accompanied by payment of the amount, if any, by which the amount due exceeds the Estimated Payments made by Debtors. Within thirty (30) days after the Claim is paid in full, CFB shall refund to Debtors the Estimated Payments, if any, in excess of the amount applied to real estate taxes on the Estate Drive Premises.

(c)    In addition to the above described payments, commencing on the Closing Date, and continuing on the same day of each month thereafter until the Claim is paid in full, Debtors shall deposit the sum of $200.00 per month in a demand deposit account maintained at CFB as a reserve for maintenance and repair of the Estate Drive Premises (the "Estate Drive Reserve Payment"). Debtors shall use funds deposited in such account solely for expenses incurred to maintain and repair of the Estate Drive Premises and shall provide CFB with any itemized written statement of all expenses paid from such account during each calendar month within thirty (30) days after the last day of each calendar month. The amount of the Estate Drive Reserve Payment shall be adjusted on each anniversary of the Effective Date if CFB, in its reasonable discretion determines that the amount is insufficient to pay the reasonable expenses likely to be incurred to properly maintain the Estate Drive Premises during the ensuing twelve (12) month period.

(d)    In the event debtors default in (i) any payment provided above and fail to cure such default within fourteen (14) days or (ii) performance of any other term or condition of the Plan or the Loan Documents (as modified by the Plan) and fail to cure such default within thirty (30) days, CFB may file a certification of such default with the Court and serve a copy on Debtors' counsel, and further, provided that Debtors shall not be entitled to more than two (2) cures in any 12-month period. Upon the filing of such certification, the automatic stay with respect to the Estate Drive Premises shall be terminated, without further notice or hearing, and the unpaid balance of the Claim shall be immediately due and payable.

*Class 3 – Community First Bank Claim in the approximate amount of $63,614.82,* prior to Debtors receiving credit for all pre-confirmation adequate protection payments. Debtors shall pay this Claim in full, with interest at the rate of 6.00 percent per annum commencing on the Effective Date, in fifty nine (59) equal monthly installments of principal and interest based on a twenty (20) year amortization period, and a final payment of all unpaid principal and interest on the fifth (5th) anniversary of the Closing Date; said payments commencing on or before the Closing Date, and further, provided as follows:

(a)    Except as otherwise expressly provided herein, all terms and conditions of the loan documents evidencing or securing this Claim (the "Loan Documents") shall remain in full force and effect and Claimant also shall retain all liens securing payment of this Claim until payment in full is made.

(b)    In addition to monthly payments of principal and interest, commencing on the Closing Date, and continuing on the same day of each month thereafter until the Claim is paid in full, Debtors shall pay CFB a monthly payment

to be applied to real estate taxes on the real property commonly known as 2864 North 89th Street in Fairview Heights, Illinois, (the "Fairview Heights Premises"), as estimated by CFB from time to time in its reasonable discretion (the "Estimated Payment"). The amount of the Estimated Payment shall be $420.00, until the real estate taxes on the Fairview Heights Premises for the year 2012 have been paid in full. Thereafter, the amount of the Estimated Payment shall be equal to one twelfth (1/12) of the estimated amount of the real estate taxes for 2013 and subsequent years. Bank shall use and apply the Estimated Payments to pay real estate taxes on the Fairview Heights Premises upon Debtors' timely presentation of tax statements to Bank, accompanied by payment of the amount, if any, by which the amount due exceeds the Estimated Payments made by Debtors. Within thirty (30) days after the Claim is paid in full, CFB shall refund to Debtors the Estimated Payments, if any, in excess of the amount applied to real estate taxes on the Fairview Heights Premises.

(c)    In addition to the above described payments, commencing on the Closing Date, and continuing on the same day of each month thereafter until the Claim is paid in full, Debtors shall deposit the sum of $50.00 per month in a demand deposit account maintained at CFB as a reserve for maintenance and repair of the Fairview Heights Premises (the "Fairview Heights Reserve Payment"). Debtors shall use funds deposited in such account solely for expenses incurred to maintain and repair of the Fairview Heights Premises and shall provide CFB with any itemized written statement of all expenses paid from such account during each calendar month within thirty (30) days after the last day of each calendar month. The amount of the Fairview Heights Reserve Payment shall be adjusted on each anniversary of the Effective Date if CFB, in its reasonable discretion determines that the amount is insufficient to pay the reasonable expenses likely to be incurred to properly maintain the Fairview Heights Premises during the ensuing twelve (12) month period.

(d)    In the event debtors default in (i) any payment provided above and fail to cure such default within fourteen (14) days or (ii) performance of any other term or condition of the Plan or the Loan Documents (as modified by the Plan) and fail to cure such default within thirty (30) days, CFB may file a certification of such default with the Court and serve a copy on Debtors' counsel, and further, provided that Debtors shall not be entitled to more than two (2) cures in any 12-month period. Upon the filing of such certification, the automatic stay with respect to the Fairview Heights Premises shall be terminated, without further notice or hearing, and the unpaid balance of the Claim shall be immediately due and payable.

*Class 4 – Community First Bank Claim in the approximate amount of $8,961.81,* prior to Debtors receiving credit for all pre-confirmation adequate protection payments. Debtors shall pay this Claim in full, with interest at the rate of 6.00 percent per annum commencing on the Effective Date, in fifty nine (59) equal monthly installments of principal and interest based on a twenty (20) year amortization period, and a final payment of all unpaid principal and interest on the fifth (5th) anniversary of the Closing Date; said payments commencing on or before the Closing Date, and further, provided as follows:

(a)    Except as otherwise expressly provided herein, all terms and

conditions of the loan documents evidencing or securing this Claim (the "Loan Documents") shall remain in full force and effect and Claimant also shall retain all liens securing payment of this Claim until payment in full is made.

(b)       In the event debtors default in (i) any payment provided above and fail to cure such default within fourteen (14) days or (ii) performance of any other term or condition of the Plan or the Loan Documents (as modified by the Plan) and fail to cure such default within thirty (30) days, CFB may file a certification of such default with the Court and serve a copy on Debtors' counsel, and further, provided that Debtors shall not be entitled to more than two (2) cures in any 12-month period.  Upon the filing of such certification, the automatic stay with respect to the Gettysburg Premises, the Estate Drive Premises and the Fairview Heights Premises shall be terminated, without further notice or hearing, and the unpaid balance of the Claim shall be immediately due and payable.

*Class 5 – Bank of America Claim in the amount of $32,483.87*.  The Reorganized Debtors shall pay this Claim in full, at 5.875 percent interest, amortized over 240 months from the Effective Date; said payments commencing on or before the Closing Date, and further, provided that the Reorganized Debtors shall remain obligated to perform all of their obligations under the original loan documents and that this Claimant also shall retain its Prepetition liens on the real estate, located at 27-29 South 57th Street in Belleville, Illinois, securing repayment of this indebtedness until payment in full is made.

At full occupancy, this duplex generates monthly income of $1,500.00 and at 90 percent occupancy, the monthly income is $1,350.00.  This is the first lien on this real estate.  The Plan provides that Bank of America would receive $232.72 per month in principal and interest on its claim.  The Reorganized Debtors would remain responsible for timely payment of real estate taxes and insurance on this property in the approximate amount of $263.31, for a total monthly payment amount of $496.03.45.

Miscellaneous maintenance and reserve for replacement costs for this duplex are estimated to run $100.00 per month.

*Class 6 – Bank of America Claim in the amount of $22,237.46*.  The Reorganized Debtors shall pay this Claim in full, at 6.00 percent interest, amortized over 240 months from the Effective Date; said payments commencing on or before the Closing Date, and further, provided that the Reorganized Debtors shall remain obligated to perform all of their obligations under the original loan documents and that this Claimant also shall retain its Prepetition liens on the real  estate, located at 27-29 South 57th Street in Belleville, Illinois, securing repayment of this indebtedness until payment in full is made.

This is the second lien on this real estate.  The Plan provides that Bank of America would receive $159.32 per month in principal and interest on its claim.  There is no escrow payment for real estate taxes and insurance, nor for miscellaneous maintenance or reserve for replacement, since said costs are provided for in the

payment of the first lien on this rental property.

*Class 7 – Bank of America Claim in the amount of $37,424.67.*  The Reorganized Debtors shall pay this Claim in full, at 6.00 percent interest, amortized over 240 months from the Effective Date; said payments commencing on or before the Closing Date, and further, provided that the Reorganized Debtors shall remain obligated to perform all of their obligations under the original loan documents and that this Claimant also shall retain its Prepetition liens on the real estate, located at 2930-32 Vernier Road in Belleville, Illinois, securing repayment of this indebtedness until payment in full is made.

At full occupancy, this duplex generates monthly income of $1,550.00 and at 90 percent occupancy, the monthly income is $1,395.00.  This is the first lien on this real estate.  The Plan provides that Bank of America would receive $268.12 per month in principal and interest on its claim.  The Reorganized Debtors would remain responsible for timely payment of real estate taxes and insurance on this property in the approximate amount of $352.43, for a total monthly payment amount of $620.55.

Miscellaneous maintenance and reserve for replacement costs for this duplex are estimated to run $100.00 per month.

*Class 8 – Bank of America Claim in the amount of $12,933.65.*  The Reorganized Debtors shall pay this Claim in full, at 6.00 percent interest, amortized over 240 months from the Effective Date; said payments commencing on or before the Closing Date, and further, provided that the Reorganized Debtors shall remain obligated to perform all of their obligations under the original loan documents and that this Claimant also shall retain its Prepetition liens on the real estate, located at 2930-32 Vernier Road in Belleville, Illinois, securing repayment of this indebtedness until payment in full is made.

This is the second lien on this real estate.  The Plan provides that Bank of America would receive $92.66 per month in principal and interest on its claim.  There is no escrow payment for real estate taxes and insurance, nor for miscellaneous maintenance or reserve for replacement, since said costs are provided for in the payment of the first lien on this rental property.

*Class 9 – Bank of America Claim in the amount of $27,010.88.*  The Reorganized Debtors shall pay this Claim in full, at 6.00 percent interest, amortized over 240 months from the Effective Date; said payments commencing on or before the Closing Date, and further, provided that the Reorganized Debtors shall remain obligated to perform all of their obligations under the original loan documents and that this Claimant also shall retain its Prepetition liens on the real estate, located at 3539 Marian Court (Front & Rear) in Belleville, Illinois, securing repayment of this indebtedness until payment in full is made.

At full occupancy, this duplex generates monthly income of $1,296.00 and at 90 percent occupancy, the monthly income is $1,166.40.  This is the first lien on this

real estate. The Plan provides that Bank of America would receive $193.51 per month in principal and interest on its claim. The Reorganized Debtors would remain responsible for timely payment of real estate taxes and insurance on this property in the approximate amount of $293.51, for a total monthly payment amount of $487.02.

Miscellaneous maintenance and reserve for replacement costs for this duplex are estimated to run $100.00 per month.

*Class 10 – Bank of America Claim in the amount of $22,141.15.* The Reorganized Debtors shall pay this Claim in full, at 6.00 percent interest, amortized over 240 months from the Effective Date; said payments commencing on or before the Closing Date, and further, provided that the Reorganized Debtors shall remain obligated to perform all of their obligations under the original loan documents and that this Claimant also shall retain its Prepetition liens on the real estate, located at 3539 Marian Court (Front & Rear) in Belleville, Illinois, securing repayment of this indebtedness until payment in full is made.

This is the second lien on this real estate. The Plan provides that Bank of America would receive $158.63 per month in principal and interest on its claim. There is no escrow payment for real estate taxes and insurance, nor for miscellaneous maintenance or reserve for replacement, since said costs are provided for in the payment of the first lien on this rental property.

*Class 11 – GMAC Claim in the amount of $55,427.22.* The Reorganized Debtors shall pay this Claim in full, at 6.00 percent interest, amortized over 240 months from the Effective Date; said payments commencing on or before the Closing Date, and further, provided that the Reorganized Debtors shall remain obligated to perform all of their obligations under the original loan documents and that this Claimant also shall retain its Prepetition liens on the real estate, located at 4911 West Main Street in Belleville, Illinois, securing repayment of this indebtedness until payment in full is made.

At full occupancy, this duplex generates monthly income of $1,375.00 and at 90 percent occupancy, the monthly income is $1,237.50. The Plan provides that GMAC would receive $397.10 per month in principal and interest on its claim. The Reorganized Debtors would remain responsible for timely payment of real estate taxes and insurance on this property in the approximate amount of $309.47, for a total monthly payment amount of $706.57.

Miscellaneous maintenance and reserve for replacement costs for this duplex are estimated to run $100.00 per month.

*Class 12 – GMAC  Claim in the amount of $66,225.69.* The Reorganized Debtors shall pay this Claim in full, at 6.00 percent interest, amortized over 240 months from the Effective Date; said payments commencing on or before the Closing Date, and further, provided that the Reorganized Debtors shall remain obligated to perform all of their obligations under the original loan documents and that this Claimant also

shall retain its Prepetition liens on the real estate, located at 9201 St. Clair Avenue in Fairview Heights, Illinois, securing repayment of this indebtedness until payment in full is made.

At full occupancy, this 3-unit apartment building generates monthly income of $2,075.00 and at 90 percent occupancy, the monthly income is $1,867.50. The Plan provides that GMAC would receive $474.46 per month in principal and interest on its claim. The Reorganized Debtors would remain responsible for timely payment of real estate taxes and insurance on this property in the approximate amount of $434.61, for a total monthly payment amount of $909.07.

Common areas, miscellaneous maintenance, and reserve for replacement costs for this apartment building estimated to run $150.00 per month.

*Class 13 – GMAC  Claim in the amount of $67,413.99.*  The Reorganized Debtors shall pay this Claim in full, at 6.00 percent interest, amortized over 240 months from the Effective Date; said payments commencing on or before the Closing Date, and further, provided that the Reorganized Debtors shall remain obligated to perform all of their obligations under the original loan documents and that this Claimant also shall retain its Prepetition liens on the real estate, located at 4917-19 West Main Street in Belleville, Illinois, securing repayment of this indebtedness until payment in full is made.

At full occupancy, this duplex generates monthly income of $1,400.00 per month and at 90 percent occupancy, the monthly income is $1,260.00 per month. The Plan provides that GMAC would receive $482.97 per month in principal and interest on its claim, plus an escrow payment of approximately $322.74, for a total monthly payment amount of $805.71.

Miscellaneous maintenance and reserve for replacement costs for this duplex are estimated to run $100.00 per month.

*Class 14 – M&T Bank Claim in the amount of $18,534.35.*  The Reorganized Debtors shall pay this Claim in full, at 4.00 percent interest, amortized over 240 months from the Effective Date; said payments commencing on or before the Closing Date, and further, provided that the Reorganized Debtors shall remain obligated to perform all of their obligations under the original loan documents and that this Claimant also shall retain its Prepetition liens on the real estate, located at 4319 Caseyville Avenue in East St. Louis, Illinois, securing repayment of this indebtedness until payment in full is made.

At full occupancy, this duplex generates monthly income of $1,240.00 per month and at 90 percent occupancy, the monthly income is $1,116.00 per month. The Plan provides that M&T Bank would receive $132.79 per month in principal and interest on its claim.  The Reorganized Debtors would remain responsible for timely payment of real estate taxes and insurance on this property in the approximate amount of $272.49, for a total monthly payment amount of $305.28.

Miscellaneous maintenance and reserve for replacement costs for this duplex are estimated to run $100.00 per month.

*Class 15 – First County Bank Claim in the approximate amount of $47,248.40, prior to Debtors receiving credit for all pre-confirmation adequate protection payments.* The Reorganized Debtors shall pay this Claim in full, at 6.00 percent interest, amortized over 180 months from the Effective Date; said payments commencing on or before the Closing Date, and further, provided that the Reorganized Debtors shall remain obligated to perform all of their obligations under the original loan documents and that this Claimant also shall retain its Prepetition liens on the real estate, located at 1411 Magdalena Street in Fairview Heights, Illinois, securing repayment of this indebtedness until payment in full is made.

a.    At full occupancy, this 4 BR, 1 BA frame house generates annual income of $10,200.00 or $850.00 per month and at 90 percent occupancy, the annual income is $9,180.00 or $765.00.00 per month. The Restated Plan with Amendments provides that First County Bank would receive $398.71 per month in principal and interest on its claim. The Reorganized Debtors would remain responsible for timely payment of real estate taxes and insurance on this property in the approximate amount of $284.67, for a total monthly payment amount of $683.38. Miscellaneous maintenance and reserve for replacement costs for this house are estimated to run $50.00 per month.

b.    In the event debtors default in (i) any payment provided above and fail to cure such default within fourteen (14) days or (ii) performance of any other term or condition of the Plan or the Loan Documents (as modified by the Plan) and fail to cure such default within thirty (30) days, First County Bank may file a certification of such default with the Court and serve a copy on Debtors' counsel, and further, provided that Debtors shall not be entitled to more than two (2) cures in any 12-month period.. Upon the filing of such certification, the automatic stay with respect to the real estate located at 1411 Magdalena Street in Fairview Heights, Illinois, shall be terminated, without further notice or hearing, and the unpaid balance of the Claim shall be immediately due and payable.

*Class 16 – First County Bank Claim in the approximate amount of $327,892.42, prior to Debtors receiving credit for all pre-confirmation adequate protection payments.* The Reorganized Debtors shall pay this Claim in full, at 6.00 percent interest, amortized over 180 months from the Effective Date; said payments commencing on or before the Closing Date, and further, provided that the Reorganized Debtors shall remain obligated to perform all of their obligations under the original loan documents and that this Claimant also shall retain its Prepetition liens on the real estate, located at 10 South 35th Street in Belleville, Illinois, and at 304 Estate Drive in O'Fallon, Illinois, securing repayment of this indebtedness until payment in full is made.

a.    At full occupancy, the 7-unit apartment building and the 4-unit apartment building generate monthly income of $7,403.00 and at 90 percent occupancy, the monthly income is $6,662.70. The Restated Plan with Amendments provides that First County Bank would receive $2,766.94 per month in principal and

interest on its claim.  The Reorganized Debtors would remain responsible for timely payment of real estate taxes and insurance on these properties in the approximate amount of $355.63, for a total monthly payment amount of $3,122.57.  Common areas, miscellaneous maintenance and reserve for replacement costs for these apartment buildings are estimated to run $550.00 per month.

       b.      In the event debtors default in (i) any payment provided above and fail to cure such default within fourteen (14) days or (ii) performance of any other term or condition of the Plan or the Loan Documents (as modified by the Plan) and fail to cure such default within thirty (30) days, First County Bank may file a certification of such default with the Court and serve a copy on Debtors' counsel, and further, provided that Debtors shall not be entitled to more than two (2) cures in any 12-month period..  Upon the filing of such certification, the automatic stay with respect to the real estate located at 10 South 35th Street in Belleville, Illinois, and at 304 Estate Drive in O'Fallon, Illinois, shall be terminated, without further notice or hearing, and the unpaid balance of the Claim shall be immediately due and payable.

*Class 17 – Wyndham Vacation Resorts Claim in the amount of $7,958.47.*  The Reorganized Debtors shall execute a deed surrendering an interest in a Timeshare in full satisfaction of this Claim.

*Class 18 – St. Louis Community Credit Union Claim in the approximate amount of $20,906.36.* The Reorganized Debtors shall pay this Claim in full, at 5.25 percent interest, amortized over 60 months from the Effective Date; said payments commencing on or before the Closing Date, and further provided that this Claimant also shall retain its Prepetition lien on the personal property, a 2012 GMC Sierra pickup truck, securing repayment of this indebtedness until payment in full is made.

The plan provides that St. Community Credit Union would receive $396.00 per month in principal and interest on its claim.  The Reorganized Debtors would remain responsible for maintaining full insurance coverage on the vehicle with the credit union named as loss payee until all payments on the claim have been made.

3.  Unsecured Claims – Class 19

(a)  Each Claimant holding an Unsecured Claim, except as otherwise set forth in this Plan, shall be paid by the Reorganized Debtors from an escrow account, funded in the amount of $4,000.00 per month for 60 months until a total pool amount of $240,000.00 has been paid with funds generated from the continued operation of their business or until such time as there is a recovery, if any, from the proceeds of that breach of contract lawsuit entitled *Sharon Williams-Johnson v. St. Clair County, Illinois*, Case No. 11-AR-963, in the St. Clair Circuit Court in Belleville, Illinois, provided, however, that the Reorganized Debtors shall not pay more than the total amount of the Allowed Unsecured Claims from either the stream of income from continued operation of their business or from the lawsuit recovery, if any, excluding the Allowed Unsecured Claims held by the servicers of student loans, which the Reorganized Debtors, in their sole discretion, may treat as an ongoing payment obligation over 240 months following the effective date of the Plan.

(b) With respect to those Unsecured Claims that are Allowed Claims on the Closing Date, a pro-rata amount of such Claimant's Allowed Claim, with said amount being calculated in proportion to the total amount of all Allowed Unsecured Claims, on monthly basis over a period of 60 months after the Closing Date.

(c) With respect to those Unsecured Claims that become Allowed Claims after the Closing Date, a pro-rata amount of such Claimant's Allowed Claim with said amount being calculated in proportion to the total amount of all Allowed Unsecured Claims on monthly basis over a period of 58 months after the Closing Date.

(d) Such other treatment as may be agreed upon between a Claimant and the Reorganized Debtors.

B. Means for Funding the Plan.

The Reorganized Debtors shall supply, from the stream of income generated from their continued operations and from the damages awarded, less attorney fees and costs, in that certain lawsuit entitled *Sharon Williams-Johnson v. St. Clair County, Illinois*, Case No. 11-AR-963, in the St. Clair Circuit Court in Belleville, Illinois, all funds necessary to make the distributions on the Allowed Claims of all Claimants in accordance with the terms of this Plan.

C. Objections to Claims and Determination of Secured or Priority Status.

1. Reservation of Right to Bring Actions

The Reorganized Debtors reserve the right for up to 60 days following Confirmation of the Plan, the "Claims Allowance Period," or longer, if such extension is granted by the Bankruptcy Court upon the request of the Reorganized Debtors:

(a) To object to or to reclassify Claims not expressly allowed herein;

(b) To object to Claims resulting from the rejection of unexpired leases or executory contracts;

(c) To object to Claims of entities added to Debtors' Schedules by way of amendment;

(d) To commence proceedings against entities to determine a Creditor's secured or priority status, and,

(e) To continue or commence actions against any party, Creditor, or Person, including, but not limited to, those described on Exhibit 2 to the Plan.

2. Debtors' Authority

The Reorganized Debtors shall have the exclusive authority to file and/or otherwise pursue any proceeding described in Section 6.1(a) to Section 6.1(e) of the Plan, and to settle, compromise, withdraw or litigate to judgment such actions.

(a)  Distribution Upon or Pending Resolution

At the end of the Claims Allowance Period and to the extent permitted by 11 U.S.C. §502(e)(1), the Reorganized Debtors shall fund an escrow account for payment of any Claims that are not yet Disallowed or Allowed in the amount of the Claim shown on Claimant's proof of claim or, if no proof of claim was filed, on Debtors' Schedules, subject to Section 6.5 of the plan herein.  If an estimation request is filed before the end of the Claims Allowance Period, the Reorganized Debtors initially may fund the escrow account at the amount proposed by them for such Claim, provided, however, that the Reorganized Debtors immediately will fund any additional funds, based on an order of the Bankruptcy Court in the estimation proceeding.  Any overpayment to this account will be treated as set forth in Section 8 of the plan.

(b)  Ongoing Litigation

The Reorganized Debtors may (i) liquidate all ongoing litigation matters of any nature in the claims liquidation process in this Bankruptcy Case, or (2) continue to prosecute all ongoing litigation matters as disputed claims in the forum in which they currently reside.  Any judgment or other payment due that is not covered by insurance shall be treated as a Class 19 Claim and payable when allowed.  Nothing contained in this Section shall constitute or be deemed a waiver of any Claim, right, or cause of action that Debtors may have against any Person in connection with or arising out of any such ongoing litigation.

(c)  Distribution Upon or Pending Resolution; Estimation

At any time, the Reorganized Debtor may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by §502(c) and §502(e) of the Bankruptcy Code, regardless of whether the Debtors previously have objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Claim, the Reorganized Debtors may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.  All of the aforementioned Claim objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.  ESTABLISHMENT OF CLAIMS BAR DATE.

The Bankruptcy Court entered a notice on July 13, 2012, setting the Bar Date for creditors' Claims as November 13, 2012.  This Bar Date notice was served on all creditors and interested

parties of record listed on Debtors' Schedules and all amendments thereto.  As a result, midnight on November 13, 2012, was the deadline on or before which a Prepetition claim must have been filed to be treated as timely. Claimants not filing their Prepetition proof of claim or Interest by the approved Bar Date shall have forfeited participation in Debtors' Estate or any disposition under this Plan.

E.  ESCHEAT.

All Creditors receiving distributions under this Plan shall negotiate each such distribution check within 90 days of receipt or the payment on the check will be stopped and the funds will escheat to the Reorganized Debtors.  In the event there are interim distributions to holders of Allowed Claims and a holder's payment from an earlier interim distribution has escheated to the Reorganized Debtors, then no further payments will be made to such holder and such Claim thereafter will be treated as though it had been disallowed

F.  UNEXPIRED LEASES AND EXECUTORY CONTRACTS.

1.  Assumption and Rejection of Leases and Executory Contracts

All prepetition unexpired and expired executory contracts and leases, including all contracts that are the subject of agreed orders of adequate protection, and which previously have not been rejected by Debtor, shall be deemed to have been assumed by the Reorganized Debtors, pursuant to the provisions of §365 of the Bankruptcy Code on the Effective Date.

2.  Cure Payments for Assumed Leases and Contracts

On or before the Closing Date, the Reorganized Debtors shall pay in full all amounts necessary to cure all claims of default or for adequate protection, if any, arising as a result of its assumption hereunder of any executory contract or lease, including all unexpired leases for non-residential real property, pursuant to the provisions of 11 U.S.C. §365, provided, however, that the Reorganized Debtors shall remain responsible for performing all obligations and for all outstanding obligations arising under any agreement or promissory note under an assumed lease for non-residential real property.

3.  Rejection Damage Claims

Claims for damages, if any, suffered by any person or entity as a party to any rejected executory contract or lease shall be included in Class 19, provided, however, that such Claims are filed with the Bankruptcy Court and with Debtors on or before the Effective Date, which is the deemed date of such rejection.

G.  EFFECT OF CONFIRMATION OF PLAN.

1.  Vesting of Property

Upon the Effective Date, and, except to the extent provided for under the provisions of this Plan, the Reorganized Debtors shall be vested with title to all property of their Estate and all claims or causes of action in their favor arising under the Bankruptcy Code or under applicable non-

bankruptcy law.

### 2. Treatment of Contingent or Unliquidated Claims

Until such time as a contingent Claim becomes fixed and Allowed, such Claim shall be treated as a Contested Claim for purposes related to allowance and distribution under this Plan and resolved according to the Bankruptcy Code, as applicable.

### 3. Injunction

Notwithstanding any otherwise applicable law to the contrary, except as otherwise expressly provided in this Plan, or the Confirmation Order, each and every entity, as defined in the Bankruptcy Code, who holds or may hold claims of any nature, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, against Debtors are permanently enjoined, on and after the Confirmation Date, from in any way commencing, continuing or enforcing in any manner an action to collect such claim.

### 4. Exculpation

Debtors, advisors, Professionals, or agents shall not have, nor incur, any liability for any act or omission in connection with, related to, or arising out of any Claims against Debtors in this Chapter 11 Bankruptcy Case, including, but not limited to, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence as determined by a Final Order of the Bankruptcy Court, and, in all respects, said parties shall be entitled to rely upon the advice of their own counsel with respect to their duties and responsibilities under the Plan.

### 5. Releases

As of the Closing Date, in consideration for the performance of the obligations of the Reorganized Debtors under this Plan, to the fullest extent permissible under applicable law, including such law as may be extended subsequent to the Effective Date, each entity that holds or may hold a Claim, arising out of this Chapter 11 Bankruptcy Case, against Debtors shall be deemed to forever release, waive and discharge all such Claims and causes of action.

### 6. Debtors' Post-Confirmation Obligations

The Reorganized Debtors shall remain responsible for compliance with all Federal, state and local laws and regulations associated with the continued operations of its business.

## H. RETENTION OF JURISDICTION.

### 1. Broad Retention

Entry of the Confirmation Order, the occurrence of the Effective Date or Consummation of the Plan notwithstanding, the Bankruptcy Court shall retain such jurisdiction as is legally permissible to ensure that all provisions of this Plan are carried out.

2.  Other Specific Purposes

The Bankruptcy Court shall retain jurisdiction in this bankruptcy case for the following purposes:

(a)  To modify this Plan after Confirmation, pursuant to the provisions of 11 U.S.C. §1127, but subject to the limitations set forth in 11 U.S.C. §1122, 11 U.S.C. §1123, and 11 U.S.C. §1125.

(b)  To determine requests for payment of Claims entitled to priority under the provisions of 11 U.S.C. §507(a)(1), including compensation of and reimbursement of expenses of parties entitled thereto;

(c)  To resolve controversies and disputes regarding interpretation and implementation of this Plan;

(d)  To determine any and all applications, Claims, adversary proceedings, and contested or litigated matters pending on the Effective Date;

(e)  To determine any action reserved to Reorganized Debtors in Section 6.1 of the Plan;

(f)  To allow, disallow, estimate, liquidate or determine any Claim against Debtors and to tender or enforce any order requiring the filing of any such Claim before a particular date;

(g)  To determine any and all pending motions for the rejection of executory contracts or leases, and to hear and determine, and if need be to liquidate, any and all Claims arising therefrom;

(h)  To correct any defect, cure any omission, or reconcile any inconsistency in this Plan or the Order of Confirmation as may be necessary to carry out the purposes and intent of the Plan;

(i)  To decide issues concerning Federal tax liability, reporting and withholding, if any, which may arise in connection with Confirmation or Consummation of this Plan, and,

(j)  To enter a final decree closing this Chapter 11 Bankruptcy Case when the Plan has been consummated.

3.  Final Order Closing Case

Nothing contained in Section 11 of the Plan shall preclude the Reorganized Debtors from seeking the entry of an order closing this Chapter 11 Bankruptcy Case.  Any order closing this Chapter 11 Bankruptcy Case shall provide that the Bankruptcy Court shall (i) retain jurisdiction to enforce by injunctive relief or otherwise the Confirmation Order, any other orders entered in this Case and the contractual obligations created by the Plan, and (ii) retain all other jurisdiction and

authority granted to it under the Plan.

    4.  Failure of Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise jurisdiction or is otherwise without jurisdiction over any matter arising out of this Case, including the matters set forth in Section 11 of the Plan, provided, however, that said Section shall not diminish, control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

I.  EFFECTIVE DATE AND CONSUMMATION.

    1.  Prior to the Effective Date

Prior to, and, as a condition of the Effective Date, the Confirmation Order shall be in form and substance satisfactory to Debtors.

    2.  Conditions to Confirmation

Confirmation of the Plan shall not occur unless and until each of the following conditions shall have been satisfied or waived:

        (a)  The Confirmation Order shall approve and provide for the right to pursue the actions described in Section 6.1 of the Plan.

        (b)  The Confirmation Order shall provide that full payment of all Allowed Claims of a Person by Debtor is in full and final satisfaction and payment of any and all claims such Person may have against Debtors, the Reorganized Debtors, or any duly-authorized Person or entity acting either on behalf of Debtors or the Reorganized Debtors;

        (c)  The Confirmation Order and its supporting findings of fact and conclusions of law shall be in form and substance satisfactory to Debtors and the Reorganized Debtors, and,

        (d)  Any other orders approved by the Bankruptcy Court to aid in effecting and implementing the Plan shall be satisfactory to Debtors and the Reorganized Debtors in form and substance.

    3.  Effective Date

The Reorganized Debtors shall commence to make any and all distributions authorized hereunder on or before 30 days after the Effective Date.

    4.  Consummation of the Plan

Consummation shall occur on the Closing Date.

5. Post-Confirmation Actions

After Confirmation, the Reorganized Debtors may remedy a defect or omission, or reconcile any inconsistencies in the Plan or in the Order of Confirmation in any manner as may be necessary to carry out the purposes and effect of the Plan without the approval of the Bankruptcy Court, so long as said remedy or reconciliation does not materially or adversely affect Claimants' interests.

THE FOREGOING IS A SUMMARY OF THE PLAN OF REORGANIZATION TO BE PROPOSED BY DEBTORS AND CREDITORS ARE URGED TO READ THE PLAN IN FULL WHEN IT IS DISSEMINATED. CREDITORS SHOULD CONSULT WITH COUNSEL IN ORDER FULLY TO UNDERSTAND THE PLAN, WHICH IS A PROPOSED LEGALLY BINDING AGREEMENT BETWEEN DEBTOR AND EACH CREDITOR.

## 9. CONSEQUENCES OF DEFAULT

If Debtors or the Reorganized Debtors are unable to perform the terms and conditions of this Plan, then they will be in default. The security interests and liens that survive the Plan are enforceable obligations that provide remedies in case of default. In particular, secured creditors could enforce their state law remedies and Debtors would lose their Property. Secured creditors only have recourse to the collateral securing their claims and unsecured claimants only have recourse to the Reorganized Debtors.

## 10. CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST DEBTORS SHOULD READ AND CONSIDER CAFEFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFOMRATION SET FORTH IN THIS DISCLOSURE STATEMENT, AS WELL AS OTHER DOCUMENTS RELATED TO THIS BANKRUPTCY, AND WHICH HAVE BEEN INCORPORATED INTO THIS STATEMENT BY THEIR REFERENCE HEREIN, PRIOR TO VOTING TO ACCEPT OR REJECT THIS PLAN. HOWEVER, THESE RISK FACTORS SHOULD NOT BE REGARDED AS BEING THE ONLY RISKS ASSOCIATED WITH THE PLAN AND ITS IMPLEMENTATION.

A. RISK OF NON-CONFIRMATION OF PLAN

Although Debtors believe that the Plan, including any future modifications thereto, will satisfy all of the requirements necessary for its confirmation by the Bankruptcy Court, there is no assurance the Bankruptcy Court will reach the same conclusion. In addition, there is no assurance modifications to the Plan will not be required to obtain its confirmation and such modifications might result in additional impaired classes, and, therefore, require solicitation of additional voters.

B. NON-CONSENSUAL CONFIRMATION

All Classes of Claims are considered to be impaired under the provisions of the Plan. Therefore, all Classes of Claims are entitled to vote on whether to accept or reject the Plan.

As a general principle, if an impaired Class, by a simple majority in relation to the total number of the Class claims and by a one-third majority in relation to the total amount of the Class

claims, votes not to accept a Plan, the Bankruptcy Court may still confirm the Plan at Debtors' request if at least one (1) impaired Class has voted to accept the Plan, such acceptance being determined without regard to any votes cast by an insider in such Class, if it determines that the Plan does not unfairly discriminate and is fair and equitable with respect to its treatment of the impaired Class.  Debtors believe that their Plan meets these requirements.

C.  RISKS RELATED TO FINANCIAL PROJECTIONS

Although Debtors contemplate substantial funding of Allowed Claims through a stream of income from the Reorganized Debtors' future income, Debtors do not believe there are any significant risks to the holders of Allowed Claims associated with the Reorganized Debtors' financial performance following Confirmation.  Debtors suggest their history of profitability with regard to the rental real estate supports this belief and profitability only will increase if the Plan is confirmed.

D.  RISKS RELATED TO FEDERAL INCOME TAX TREATMENT

1.  Although Debtors' Plan contemplates funding of Allowed Claims through a stream of income from the Reorganized Debtors' future income, Debtors do not believe that there are any risks to the holders of Allowed Claims associated with Debtors' tax status following Confirmation. There are no equity interests under the Plan, and the only significant changes in Debtors' tax status would be the potential that they must discount the tax basis for their assets as Reorganized Debtors, based upon a possible partial discharge of some of their indebtedness.

2.  As a general rule, however, a holder of an Allowed Unsecured Claim will recognize a gain or loss in an amount equal to the difference between (a) the amount of cash, plus the fair market value of any property, including any rights received with respect to that Claim other than a Claim representing accrued but unpaid interest, and excluding any portion required to be treated as imputed interest, and (b) such holder's adjusted tax basis in such Claim, other than any Claim representing accrued but unpaid interest.  Therefore, the recognition of a gain or loss by a holder of an Allowed Unsecured Claim under the Plan will depend on a number of factors, including whether the Claim was acquired by Debtors, and, if not, the actual amount received by the holder from the pool of funds available for payment of Allowed Unsecured Claims, the tax status of the holder, whether the Claim in respect of which the actual amount received constituted a capital asset in the holder's hands and how long it had been held, whether said Claim originally was issued at a discount or acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction in respect to such Claim.

3.  Because some holders of Claims may receive distributions from Debtors after the Effective Date, it is possible that (i) any recognition of loss by a holder of a Claim may be deferred until such holder can no longer receive future distributions under the Plan and (ii) any gain realized by a holder of a Claim would be deferred under the installment method of reporting gain for tax purposes. A holder can avoid the potential for gain deferral by electing out of the installment method of reporting. Holders are urged to consult their own tax advisors regarding the possibility for such deferral of gain or loss recognition.

4.  Distributions to any holder of an Allowed Unsecured Claim will be allocated first to the original principal amount of such Claim as determined for Federal income tax purposes and, then, to the extent the consideration exceeds such amount, to the remainder of such Claim, including,

without limitation, any portion of the Claim representing accrued Original Issue Discount, hereinafter "OID," or accrued but unpaid interest. There is no assurance that the Internal Revenue Service will respect such allocation for Federal income tax purposes.

5.   In general, to the extent that an amount received by a holder of debt is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income, if not previously included in the holder's gross income. Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest previously included in its gross income is not paid in full.

6.   All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding, including employment tax withholding. Under Federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate, currently 28 percent. Backup withholding generally applies if the holder (i) fails to furnish its social security number or other Taxpayer Identification Number, hereinafter "TIN," (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the Internal Revenue Service.

7.   Recently effective regulations promulgated by the United States Department of Treasury generally require disclosure by a taxpayer on the Federal income tax return of certain types of transactions in which the taxpayer participated after January 1, 2003, including, among other types of transactions, the following: (i) certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds; and (ii) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year. These categories are very broad; however, there are numerous exceptions. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

THE FOREGOING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

11.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A liquidation analysis is required under the Plan since all Allowed Claims of Unsecured Creditors may not be paid in full.  This liquidation analysis is based upon Debtors' estimate of the amount of the Allowed Claims filed by Unsecured Creditors in this Chapter 11 case.  The actual amount of Allowed Claims also may differ in some respects from petition estimates, these amounts

also being subject to certain risks, uncertainties, and assumptions. However, there can be no assurances the estimated Claim amounts set forth in Debtors' petition and any amendments thereto are correct or that Debtors will not object to certain Claims during the Claims Allowance process.

A.  LIQUIDATION UNDER CHAPTER 7

If no Chapter 11 plan can be confirmed, Debtors' Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code in which case a trustee will be appointed to liquidate the Debtors' assets. It is impossible to predict precisely how the proceeds of a liquidation of Debtors' assets under Chapter 7 of the Bankruptcy Code would be distributed to the respective holders of Claims against Debtors. However, Debtors believe liquidation under Chapter 7, among other things, would result in (i) significantly smaller distributions being made to creditors than those provided for in the Plan because of additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations, and (iii) the failure to realize the greater, going concern value of the Debtors' assets in the form of future rents. Debtors' liquidation analysis is premised upon a hypothetical liquidation under Chapter 7 of the Bankruptcy Code. This analysis is based upon the Debtors belief that the value of its assets would be significantly diminished if these assets are not valued in this Chapter 11 Case as a going concern.

The likely form of any liquidation under Chapter 7 of the Bankruptcy Code simply would be the recovery of proceeds, if any, from the certain lawsuit for breach of contract entitled *Sharon Williams-Johnson v. St. Clair County, Illinois*, Case No. 11-AR-963, in the St. Clair Circuit Court in Belleville, Illinois. Based on this analysis, Debtors believe that it is likely that a liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code would produce less value for distribution to both secured and unsecured creditors than under the Plan. It is Debtors' belief that recoveries projected to be available in a liquidation under Chapter 7 of the Bankruptcy Code would not likely afford holders of all Claims as great a recovery potential as does the Plan.

On the date of filing, Debtors' assets had a fair market value of approximately $792,000.00 as a going concern, based upon their average monthly gross receipts at just over 90 percent occupancy multiplied by the industry standard for valuing going concerns of 36 months. Please note this is rental income, and, in the event of liquidation under Chapter 7 of the Bankruptcy Code, each secured creditor would seek relief from the automatic stay in order to enforce its security interests under Illinois Law. It is clear, based upon Debtors' Schedule A and Schedule D, as well as the proofs of claims filed by Holders of Secured Claims on the rental real estate, some of the rental properties have equity, but it is unlikely this equity would exceed $25,000.00 at the courthouse sales in the event of liquidation, after deducting mortgagees' sales costs and attorney's fees and assuming a particular real estate property has an interested third-party buyer, other than the mortgagee simply bidding in its mortgage. In contrast, this sum would be produced and available for distribution to holders of Unsecured Claims after just six (6) months of continued operations as a going concern.

B.  ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, Debtors or any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and

continuation of the Debtors' business or an orderly liquidation of the Debtors' assets. Debtors have concluded that this Plan represents the best alternative to protect the interests of creditors and other parties in interest. Debtors believe this Plan enables them to maximize the value of their business, allowing their creditors to realize the highest recoveries under the circumstances, and to ensure continuation of their business for the benefit of their creditors, and ultimately, their retirement.

Debtors believe that Unsecured Creditors would receive less distribution in the event of a Chapter 11 liquidation of its assets than under the provisions of this Plan. Debtors' principal unencumbered asset is the potential damage awards from that certain breach of contract lawsuit entitled *Sharon Williams-Johnson v. St. Clair County, Illinois*, Case No. 11-AR-963, in the St. Clair Circuit Court in Belleville, Illinois.

In addition, when the real and personal property securing part of their indebtedness is excluded, the current "as is" market value of the Debtors' unencumbered assets is estimated to be less than $500.00. As a result, Debtors' liquidation by a receiver in state court proceeding, if this case were dismissed, or by a Chapter 7 Trustee, if this case were converted to Chapter 7, will not generate sufficient funds to fully pay their Allowed Administrative Claims, which consist primarily of two relatively small priority tax Claims. Debtors' liquidation simply would bring no meaningful return to the Unsecured Claims of its Creditors.

Moreover, at an advertised auction, the selling price of Debtors' unencumbered and non-exempt assets, likely would produce less than $500.00 of income, much less than the income that would be generated by their continued operation of the rental real estate business as Reorganized Debtors. Thus, Debtors believe this Plan of Reorganization is in the best interest of all Creditors.

## 12. CONCLUSION AND RECOMMENDATION

Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims. Other alternatives would involve delay, uncertainty and substantial administrative costs. Debtors urge holders of all Impaired Claims entitled to vote on the Plan to vote to accept it.

Debtors and Debtors-in-Possession Henry Lee Johnson Jr. and Sharon Elaine Williams-Johnson recommend that this Disclosure Statement for their Plan of Reorganization be approved.

DATED ON this the 4th day of January, 2013.

DEBTORS & DEBTORS-IN-POSSESSION

*/s/ Henry L. Johnson Jr.*
_____
Henry Lee Johnson Jr.

*/s/ Sharon Elaine Williams-Johnson*
_____
Sharon Elaine Williams-Johnson

LAW OFFICE OF R. GREGORY LATHRAM, ESQ.

*/s/ R. Gregory Lathram*

_____
Robert Gregory Lathram
203 West Main Street
Collinsville, IL 62234
618.345.4600 Telephone
618.345.4603 Facsimile
glathram@bankruptcylawyers-metroeast.com

ATTORNEYS FOR DEBTORS

Disclosure Statement 01 - Amendment